**KOPPERS CO., Inc.**

v.

**UNITED STATES.**

No. 78–52.

United States Court of Claims.

Dec. 1, 1953.

David W. Richmond, Washington, D. C., for plaintiff.

Frederick O. Graves, Miller & Chevalier, Washington, D. C., E. S. Ruffin, Jr., and C. M. Crick, Pittsburgh, Pa., were on the brief.

Elizabeth B. Davis and John E. Garvey, Washington, D. C., with whom was H. Brian Holland, Asst. Atty. Gen., for defendant.

Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

LITTLETON, Judge.

Plaintiff sues to recover $273,143.19, plus interest, claiming that such amount represents an illegal collection and overpayment of interest on "potential" excess profits tax deficiencies of $199,-854.52 and $330,981.62 for the years 1940 and 1941, respectively. These "potential" deficiencies, which, under the law and the facts of plaintiff's case for the years involved, the plaintiff was never required to pay, and which, at the time they were computed could not be legally collected, represent the amounts of excess profits tax which plaintiff would have been required to pay had it not been entitled under the facts and the law to have its excess profits tax for the years mentioned determined, computed and assessed under and in accordance with the provisions of Section 722 of the Internal Revenue Code, 26 U.S.C. § 722, 54 Stat. 986, as amended. Repealed November 8, 1945, 59 Stat. 568.

The issue presented is whether the assessment and collection of interest on such "potential" deficiencies was proper under a proper interpretation of the taxing statutes as applied to the facts of this case. These facts are not in dispute and are summarized below.

Plaintiff [1] filed excess profits tax returns for the calendar years 1940 and 1941 on the dates and reflecting the computations set out in the tabulation below:

| | Excess profits net income | Excess profits credit | Adjusted excess profits net income | Excess profits tax liability |
|---|---|---|---|---|
| 1940 return filed 9–15–41............ | $3,656,110.35 | $3,864,935.25 | .................... | .................... |
| Amended 1940 return, filed 7–21–44.. | 3,653,890.77 | 3,623,876.29 | $25,014.48 | $6,512.76 |
| 1941 return filed 6–15–42............ | 9,613,646.26 | 3,494,726.10 | 3,113,920.16 | 1,822,352.10 |
| Amended return 1941, filed 6–20–42.. | 6,545,206.33 | 3,494,726.10 | 3,045,480.23 | 1,781,288.14 |

1. Koppers Company, Inc., is successor by merger of Koppers United Company and its subsidiaries, which filed consolidated excess profits tax returns for 1940 and

The tax for 1940 was paid in installments of $3,000 on March 15, 1941; $3,000 June 13, 1941, and $512.75 July 21, 1944. The tax for 1941 was paid quarterly during 1942.

On September 15, 1943, plaintiff filed, pursuant to law, applications for determination and assessment of its profits tax under the provisions of the Internal Revenue Code, claiming, at the same time, refunds of $6,000 of the excess profits tax paid for 1940, and $1,781,-288.14 of such tax paid for 1941. The claim for 1940 was reduced to $22.56 by an amended application filed September 10, 1945, and the 1941 claim was lowered to $541,103.86 by an amended application of November 20, 1945. By timely consents filed, the plaintiff and the Commissioner of Internal Revenue mutually agreed that the amount of any income, excess profits, or war profits tax due by Koppers United Company, as parent of the consolidated group, for 1940 and 1941, might be assessed at any time on or before June 30, 1951.

The differences between the plaintiff and the Commissioner of Internal Revenue with respect to their respective claims were not reconciled until December 16, 1950, on which date plaintiff executed an "Agreement to Amount of Constructive Average Base Period Net Income Determined Under Section 722, Internal Revenue Code" (Form EPC–1), in which the constructive average base period net income for 1940 and 1941 was set out as $2,801,598.22 and $3,394,-944.93, respectively. These amounts so determined and agreed to were approved by the Excess Profits Tax Council, Bureau of Internal Revenue, on January 10, 1951.

At various times the Internal Revenue Agent in Charge at Pittsburgh, Pennsylvania, forwarded to plaintiff copies of reports concerning examination of plaintiff's excess profits tax returns in which were proposed excess profits net income, excess profits credits and deficiencies in excess profits tax for 1940 and 1941, as follows:

1940

| Date of transmittal letter | Proposed excess profits net income | Proposed excess profits credit | Proposed deficiency in excess profits tax |
|---|---|---|---|
| Sept. 23, 1946 | $4,158,504.30 | $2,612,509.89 | $710,753.85 |
| Mar. 1, 1949 | 3,543,895.44 | 2,256,809.26 | 594,385.50 |
| Feb. 9, 1951 | 3,280,942.26 | 2,661,518.31 | 260,554.39 |

1941

| Date of transmittal letter | Proposed excess profits net income | Proposed excess profits credit | Proposed excess profits tax deficiency |
|---|---|---|---|
| Apr. 29, 1949 | $6,102,978.68 | $2,576,117.11 | $272,078.42 |
| Feb. 9, 1951 | 6,353,492.13 | 3,143,429.68 | 95,749.33 |

The letters of February 9, 1951, reflected the agreement reached with respect to the determination, computation and assessment of the tax under Section 722, *supra*, as determined by the Excess Profits Tax Council.

Plaintiff executed and filed a waiver (Form TF 874) on February 14, 1951,

1941. Although the merger did not occur until November 10, 1944 (finding 2), as a matter of convenience we shall refer to the taxpayer as "plaintiff" without regard to the corporate structure at any particular time.

consenting *inter alia* to the assessment and collection of deficiencies in its excess profits tax for 1940 and 1941, in the respective amounts of $260,554.39 and $95,749.33. In determining these deficiencies, the Commissioner first *computed* the excess profits tax for each of the years without regard to Section 722. However, at that time (February 26 and 27, 1951) a written agreement had been executed by the parties, both as to the amount of taxable net income and the amount of tax liability under Section 722. The results of the Commissioner's computations are reflected below:

|  | 1940 | 1941 |
|---|---|---|
| Excess profits tax net income | $3,280,942.26 | $6,353,492.13 |
| Excess profits credit | 2,261,809.26 | 2,576,117.11 |
| Adjusted excess profits net income | 1,014,133.00 | 3,772,375.02 |
| Excess profits tax before application of § 722 | 466,921.67 | 2,208,019.09 |
| Excess profits tax shown on return and paid | 6,512.76 | 1,781,288.14 |
| Excess profit tax before determination under § 722, but after allowing credits for payments made | 460,408.91 | 426,730.95 |

After the above calculations had been made, the Commissioner gave effect to the determination of the tax under Section 722 ($199,854.52 for 1940 and $330,981.62 for 1941), which made the excess profits tax liability determined and collectible those amounts rather than the *computed* but uncollectible amounts of $460,408.91 and $426,730.95. On March 8, 1951, the Commissioner issued his statutory notice of deficiencies, which read in part, as follows:

"You are advised that the determination of your excess profits tax liability for the years ended December 31, 1940, 1941, * * * discloses deficiencies of $260,554.39, $95,749.33 * * * respectively."

No such notice was given by the Commissioner with respect to his computation of the excess profits tax other than the above quoted deficiency notice under Section 722. However, when the Bureau of Internal Revenue came to the computation of interest, such interest was computed on an excess profits tax *computed* by the Bureau without regard to the facts of plaintiff's case and the provisions of Section 722. This resulted in interest amounts of $217,376.07 for 1940 on $460,408.91, from March 15, 1941, to January 28, 1949 (this date was treated as the date of payment of the determined deficiency of $260,554.39), and of $230,504.86 for 1941 on $426,730.95, from March 15, 1942, to March 16, 1951 (the last mentioned date being thirty days after the waiver of February 14, 1951, was filed).

When the Commissioner, pursuant to the waiver of February 14, 1951, assessed deficiencies in excess profits taxes of $260,554.39 for 1940 and $95,749.33 for 1941, on April 17, 1951, interest in the amounts indicated above was also assessed. These amounts were paid by plaintiff under protest.

It is plaintiff's position that its liability for interest extends only to such interest as results from computations on the amounts of the deficiencies actually determined and assessed ($260,554.39 for 1940 and $95,749.33 for 1941) rather than that resulting from computations based on the entire amounts of the potential deficiencies, that is, $460,408.91 for 1940 and $426,730.95 for 1941, which it would have had to pay but for the applicability of Section 722. Claims for refunds of the difference between interest on the actual deficiencies assessed and the potential deficiencies were timely filed with the Bureau and formally denied. The amounts claimed were $94,358.71 for 1940 and $178,784.48 for 1941. It is for recovery of the sum of these amounts ($273,143.19) that plaintiff now sues.

The determination of the propriety of the Commissioner's action in assessing interest on the potential deficiencies, described above, calls for the construction of Sections 292(a) and 271 of the Internal Revenue Code, 26 U.S.C. §§ 292 (a), 271, as well as some consideration of the nature and role of Section 722 in the excess profits tax scheme. The

quotation of the pertinent language of Sections 292(a) and 271 may be helpful in presenting the issues involved since they represent the statutory authority for the assessment of interest on taxes:

"§ 292. Interest on deficiencies

"(a) General rule. Interest upon the amount *determined* as a *deficiency* shall be assessed at the same time as the deficiency, shall be paid upon notice and demand from the collector, and shall be collected as a part of the tax, at the rate of 6 per centum per annum * * *." [Italics supplied.]

"§ 271. Definition of deficiency

"(a) In general. As used in this chapter in respect of a tax imposed by this chapter, 'deficiency' means the amount by which the tax imposed by this chapter exceeds * * * the amount shown as the tax by the taxpayer upon his return * * *."

The defendant contends that a "deficiency," as that term is used in the above provisions, existed in the amount on which interest was collected from the date of the return, and that while the application of Section 722 and the determination of the tax thereunder, "extinguished" part of this amount it did not "extinguish" the interest thereon. In this connection it is urged that insofar as interest is concerned, no distinction should be made between a net operating loss carry-back situation and the application of Section 722.

For the reasons which follow, we do not agree.

The excess profits tax, as imposed by the Revenue Act of 1940, as amended,[2] was in essence a tax on those corporate earnings which exceeded the profits realized under normal economic conditions, not stimulated by war or defense spending. To determine what profits were to be subjected to the tax, rather complex formulae were provided by which the so-called "normal" profits were calculated and denominated the "excess profits credit." The difference between the "excess profits credit" and the earnings for a particular year was the amount subjected to the tax. One of the factors employed in calculating the excess profits credit was the average of the annual profits realized during a group of representative years (1936–1939) called the "base period." The result was termed "average base period net income".[3]

It is unnecessary to go into the many ramifications of excess profits tax computations to realize that if, for any of numerous possible reasons, this average base period net income did not in fact reflect the earning norm of a corporation, the entire scheme of computation would be frustrated and gross inequities in the administration of the tax would result. It was in recognition of this possibility, or indeed this fact, that Section 722 was added to the Internal Revenue Code. This section provides in part as follows:

"In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be *determined* by using such constructive average base period net income

2. 54 Stat. 975, 26 U.S.C. §§ 710–752; 26 U.S.C. (Supp. IV), §§ 710–783. Repealed Nov. 8, 1945, 59 Stat. 568.

3. We are aware that other elements were included in the determination of average base period net income and that the "normal profit" is not entirely synonymous with "excess profit credit," but for illustrative purposes this statement is substantially correct. This treatment of the excess profits tax scheme is admittedly an oversimplification, and it is indulged in only by way of placing the purpose of Section 722 into proper perspective.

*in lieu of* the average base period net income otherwise determined under this subchapter. * * *" [Italics supplied.]

It should be immediately emphasized here that given the fact situation contemplated by this section and compliance by the taxpayer with the procedural necessities of application to the Commissioner, as required by the statute, and proof that excess profits tax (exclusive of Section 722) is excessive or discriminatory and establishes what would be a fair and just amount representing normal earnings, the constructive average base period net income was to be used *in lieu of* the average base period net income to *determine the tax*, rather than to merely *offset* the result of computations based on the latter.

The defendant would make no such distinction. Its argument is, in effect, that while the *"constructive* average base period net income" should be employed to determine the amount of the tax, the "average base period net income" must be the basis of interest computations, although such computation is on an amount which the statute itself calls "excessive" and "discriminatory."

We see no justification for such a construction. A review of the history and purpose of Section 722 convinces us that it is merely a refinement of the basic policy embodied in the excess profits tax scheme and not a departure from it.[4] It affords an alternative formula for de-termining the amount to be exacted when the economic facts of a particular corporation will not fit properly into the "average base period net income" mechanism. The result sought is a fair and equitable tax *in lieu of*, not *in mitigation of*, an excessive and discriminatory one. It follows therefore that where the factual and procedural requirements of Section 722 have been met, the Commissioner must take cognizance of that section in "determining" a "deficiency," as those terms are used in Sections 292(a) and 271. In so doing the constructive average base period net income must of necessity be used in arriving at the basis on which interest is computed as for the determination and assessment of the tax itself. Once Section 722 is, on the facts established, brought to bear on an appropriate situation it is an integral part of the applicable tax law and cannot be employed eclectically by the Commissioner of Internal Revenue.[5] The result in the factual situation of the instant case is that there were no deficiencies for 1940 and 1941, within the meaning of the interest provisions of Section 292, on which interest could properly be determined and assessed, other than the deficiencies to which plaintiff consented, which the Commissioner, on the applicable facts and the law determined and assessed, and which the taxpayer paid for 1940 and 1941. This was our decision in Henry River Mills Co. v. United States, 96 F.Supp. 477, 119 Ct.

---

4. In a study of the development of legislation dealing with excess profits taxation, one writer has made the following comment on "Relief" provisions which is especially applicable to Section 722: "The term 'relief,' however, is probably a misnomer. The provisions in question are more properly to be called refinements of either the income or credit computations. They are not acts of grace operating in defiance of the excess profits concept, but perfecting amendments in furtherance of basic policy." Peterson, "The Statutory Evolution of the Excess Profits Tax," 10 Law and Contemporary Problems 3 (1943-44). Likewise, the Committee Reports dealing with Section 722 support the position that this sec-tion's purpose was the equitable application of the same basic tax to variant economic situations. See; H.Rept.No. 146, S.Rept.No.75, on H.R. 3531 [Excess Profits Tax Amendments 1941], 77th Cong. 1st Sess.; H.Rept.No.2333, S.Rept. No.1631 [Revenue Bill of 1942], 77th Cong. 2d Sess.

5. Defendant cites in this connection American Coast Lines, Inc., v. Commissioner, 2 Cir., 159 F.2d 665, and Pohatcong Hosiery Mills v. Commissioner, 3 Cir., 162 F.2d 146. It should be noted, however, at the outset that these cases are not concerned with what interest is authorized by Section 292(a) or how interest is to be determined under Section 722.

Cl. 350, on facts which, in all material respects, were identical with those of the present case. We regard that holding as both correct and controlling here.

The defendant cites and relies upon the cases of Manning v. Seeley Tube & Box Co., 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346, and Rodgers v. United States, 108 F.Supp. 727, 123 Ct.Cl. 779, on the theory that insofar as interest is concerned there is no qualitative distinction between the net operating loss carry-back provisions of Section 122 [6] and the application of Section 722. In our opinion these cases are not in point. In the Seeley Tube case, supra, the taxpayer filed its return for 1941 and paid the amount of tax shown thereon. In 1943, after the taxpayer was bankrupt, the Commissioner determined and assessed a deficiency in the 1941 tax with interest from the date the tax was due to the assessment date. The Seeley Tube & Box Co. subsequently filed its return for 1943, disclosing a net operating loss for that year. Under the carry-back provisions of the Code this loss was sufficient to abate completely the tax liability for 1941. Upon suit by the taxpayer the Supreme Court held that plaintiff was not entitled to recover the interest previously assessed on the ground that where a deficiency and interest have been validly assessed under any applicable statutory procedure, a *subsequent* carry-back with an abatement of the deficiency does not abate the interest previously assessed. This holding is as clearly correct as it is inapposite to the case now before us. The Court was dealing there with a situation in which there was no question but that the excess profits tax for 1941, as computed under the only formula available to the taxpayer and with reference to all the economic circumstances of that corporation

*in that year,* was underpaid. Also, the tax thus computed was neither "excessive" nor "discriminatory" and no reason existed for any adjustment in the amount exacted until two years after the return was filed and subsequent to the determination and assessment of an admitted deficiency by the Commissioner. The distinction between the "carry-back" provisions and Section 722 is immediately apparent. The former permits an adjustment in a tax which is fair and equitable when imposed, due to unknown and unknowable future economic events which justify relief in a *future taxable period;* the latter affords an alternative mode of computation in the first instance where procedural requirements are met and the economic circumstances of *that taxable year* would give rise to an excessive and discriminatory tax if the usual formula were applied. In other words, given compliance with factual and procedural prerequisites, Section 122 is designed to become operable after some economic reversal in a future taxable period, while Section 722 is operable, if at all, from the time the return is filed. In view of this broad difference in purpose and operation of the two Code provisions and the divergent factual situations involved, The Seeley Tube & Box Co. case, supra, is clearly of little assistance here. The Rodgers case, supra, involved essentially the same questions and is equally not in point.

Subsection (d) of Section 722 [7] is also employed by defendant as justification for the assessment of interest on potential deficiencies. The requirement of this subsection that the taxpayer "compute its tax, file its return, and pay the tax shown on its return under this subchapter without the application [of § 722]" is urged as showing conclusively that the assessment of interest was

---

6. 26 U.S.C. § 122 (b) (1) provides in part that "If for any taxable year beginning after December 31, 1941, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-back for each of the two preceding taxable years".

7. 26 U.S.C. § 722(d) provides in part:
   "Application for relief under this section. The taxpayer shall compute its tax, file its return, and pay the tax shown on its return under this subchapter without the application of this section, except as provided in section 710(a) (5).
   * * * *"

proper here. We do not agree. It is our view that the District Court for the Southern District of Florida properly construed this provision in Kuder Citrus Pulp Co. v. United States.[8] That court concluded:

" * * * that Section [722(d)] has nothing whatsoever to do with the question of whether or not interest may be assessed upon a deficiency which would exist except for the allowance of relief under Section 722. The [sub] Section does no more than recognize the difficulties inherent in determining the amount of relief properly allowable under Section 722. It does no more than notify a taxpayer that it cannot take advantage of Section 722 on the basis of its own determination but must await determination of available relief by the Commissioner. The Section certainly does not forbid retroactive application of the relief when determined by the Commissoner."

The correctness of this construction is supported by the legislative history of the provision. The Committee Reports indicate persuasively that this provision is merely an administrative aid designed to avoid the prolonged delay in payment of *any* excess profits tax, due to the complexities inherent in the application of Section 722.[9] While there is no doubt that 722(d) could not be ignored, and the

taxpayer could not anticipate the applicability of, or apply, Section 722 in its original return, we are of the opinion that the remedy for its violation or for failure otherwise to file a substantially correct return is to be found in the penalty provisions of the U.S.Code rather than Section 292(a), under the provisions of which we think, in view of the facts and circumstances of this case, an attempt has been made to exact illegal and unauthorized interest on "potential" deficiencies never "determined" under the statute nor authorized to be asserted by law.[10]

We are not impressed by defendant's argument that failure to allow the assessment of interest on these "potential" deficiencies not recognized by statute or authorized to be assessed when Section 722 is found, under the facts to be applicable, will encourage delay in payment of the taxes by taxpayers. It may be argued with equal cogency that denial to the taxpayer of the right to undertake in its return to apply Section 722 would encourage dilatory investigation, determination and assessment of taxes under this section on requests for application of Section 722.

In the absence of a clear legislative mandate, which we do not find in the statute, we are constrained not to infer a Congressional intent to authorize and provide for the assessment of interest on a purely theoretical amount which would

8. D.C.S.D.Fla., 117 F.Supp. 395; 72,487, P–H Fed.Serv.1953.

9. Both the House and Senate Reports on the bill containing the provision which became subsection (d) of § 722 contain the following comment: "Administrative procedure: It is deemed advisable in the interest of good administration, in view of the nature of the problem presented by Section 722, that the taxpayer should not be permitted to apply the section in the computation of the excess profits tax liability shown upon its return and that the taxpayer should be required to conform to reasonable restrictions with respect to the time within which it may make application for the benefits of the section. Accordingly, under the provisions of subsection (e) [ (d) in H.Rept.] a taxpayer is not permitted to claim the

benefits of section 722 in computing its tax upon the return. A taxpayer, in order to obtain the benefits of section 722, must make an application to the Commissioner of Internal Revenue under regulations to be prescribed by the Commissioner * * *." S.Rept.No.75, 77th Cong., 1st Sess., p. 13, H.Rept.No.146, same session at p. 13.

10. On the record before us it would appear that plaintiff's returns as filed reflected substantially the correct amount of tax under the theory on which those returns were made and the tax computed, i. e., Equity Invested Capital. It was only when the "average earnings" method was employed by the Commissioner that the "potential deficiencies" now in question resulted.

have been exacted only had Congress not expressly prohibited its imposition, denominating it "excessive and discriminatory." A different conclusion could lead only to the sacrifice of a clearly intended and salutary result (determination and assessment under Sec. 722) to the futile quest for that degree of technical consistency no longer found, or for that matter required, in Federal revenue legislation.

The parties agree that defendant is entitled to a set-off of $2,926.85. Judgment will, therefore, be entered in favor of plaintiff in the sum of $270,216.34 overassessment and overpayment of interest for 1940 and 1941, together with interest thereon as provided by law.

It is so ordered.

JONES, Chief Judge, and WHITAKER, Judge, concur.

MADDEN, Judge (dissenting).

I respectfully dissent from the decision of the court. I think our decision in the Henry River Mills case, in which I joined, was wrong.

I see no escape from the mandate of Section 722 (d) of the Internal Revenue Code. It says, of the very situation here under consideration:

"(d) *Application for relief under this section.* The taxpayer shall compute its tax, file its return, and pay the tax shown on its return under this subchapter without the application of this section, except as provided in section 710(a) (5). The benefits of this section shall not be allowed unless the taxpayer within the period of time prescribed by section 322 and subject to the limitation as to amount of credit or refund prescribed in such section makes application therefor in accordance with regulations prescribed by the Commissioner with the approval of the Secretary. If a constructive average base period net income has been determined under the provisions of this section for any taxable year, the Commissioner may, by regulations approved by the Secretary, prescribe the extent to which the limitations prescribed by this subsection may be waived for the purpose of determining the tax under this subchapter for a subsequent taxable year."

If the plaintiff had done what the statute expressly requires, the Government would have had the money, the interest on which is here in question, until the amount of relief to which the plaintiff was entitled under the provisions of Section 722(a), (b), and (c), were worked out between the taxpayer and the Government. The simple fact is that the plaintiff failed to pay the tax which the statute imposed and required, and that there was, in fact, a deficiency, which persisted until it was finally learned what relief the plaintiff was entitled to.

The difference between the instant case and cases like Manning v. Seeley Tube & Box Co., 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346, and Rodgers v. United States, 108 F.Supp. 727, 123 Ct.Cl. 779, in which it was held that interest was payable on deficiencies later wiped out by the carry-back of losses from later years, is, as a practical matter, more apparent than real. To be sure, in the carry-back cases the data on which the ultimate determination of the tax must be made are not in existence when the taxpayer files his return. But in the Section 722 cases, while in a sense the facts are in existence, they might as well, in a complicated case, not be in existence, for it is plain that it will take much study and analysis and the exercise of much judgment to make the final determination as to the amount of relief to be granted the taxpayer. And, in the meantime, the statute says, he must pay his tax as if Section 722 were not in existence. Section 3771(g) of the Internal Revenue Code, 26 U.S.C.A. § 3771(g) prohibits the Government from paying interest on overpayments resulting from allowance of Section 722 relief for taxable years prior to January 1, 1942, and for later years prohibits interest for any period prior to one year after the

filing of an application for relief, or September 16, 1945, whichever is the later. These provisions show the intention of Congress that the money is intended to be collected and held by the Government, as of right, until the question of Section 722 relief is settled.